The appeal court is reconvened. Thank you. You may be seated. Good afternoon. We're ready for our next case, which is case number 415-0860. For the appellant, we have Ms. Wall. And for the appellee, we have Ms. McGrath and Mr. Mordoff. Is that correct? And you have divided your time up, correct? We have, yes. All right. Are you ready to proceed? Oh, yeah. Please do. May it please the court, counsel, my name is Dawn Wall, and I represent the YWCA of McLean County, and we are before your honors on administrative review. This is a little different than, I think, a usual administrative review, because in this particular instance, there was a local ordinance that set forth that once a determination was made by a hearing officer, that hearing officer could make recommendations to the Bloomington Human Relations Commission. The commissioners would then make a decision on whether or not they adopted the findings of the hearing officer. And if they disagreed with that determination, then the appropriate proceedings for appellate review or review by the court was to proceed with a writ of certiorari. We did that in the circuit court. And then following that, we came before your honors asserting that the findings and the application of the law found by the commission in this instance was contrary to the law, which would be a de novo review, and then also that certain factual findings were against the manifest way to the evidence. I do think it's important to note that in this instance, the commissioners did not hear all of the testimony and did not weigh the credibility of the witnesses. Counsel, in his brief for the city of Bloomington, asserts that all of the commissioners attended the hearing, but counsel was not at the hearing. And there were two dates of hearing, one at the public library, that was subsequently continued to two days later, and that was held at the city of Bloomington. I will assert to your honors that the record clearly does not indicate that all of the commissioners attended the first hearing and the same commissioners attended the second hearing. But assuming that's correct, what does that mean? I only bring that up, your honor. I was just going to say because I do think that it impacts the deference that a court typically gives to particular findings of credibility. Is there any case that so holds? There are cases that indicate that even though the court is required in certain instances to give deference to the factual findings, that when there are instances where the factual findings are not conclusive with respect to... No, that's not my question. Is there any case that so holds that if an administrative agency has some people absent during some time that the evidence is presented, as you've just argued to us, that it matters with regard to the deference due? I know of no case, your honor, where there was a circumstance where the administrative agency in whole did not participate in the fact-finding conference. I thought there was a hearing officer. There was a hearing officer appointed because the Bloomington ordinance says the commission can appoint a hearing officer who hears the testimony and then makes recommendations to the commission. But my comment to your honors was, in the city of Bloomington's brief, it essentially argues the commissioners as a whole made these determinations and they simply adopted the findings of the hearing officer. Isn't that obviously the case? Yeah, that's how we see these cases all the time. The commission or the agency adopts the findings of the hearing officer. And the hearing officer makes the credibility determinations because he or she or people were sitting there hearing the witnesses. Well, certainly an administrative law judge would, or with the industrial commission, the three-member panel of the commission makes that decision. I only point out that in this instance, the commissioners did not weigh anything. It was all done through the hearing officer. And therefore, the proposed decision and the proposed findings of the hearing officer would be what's for review by this court, particular factual findings that he made, and also application of the law that he made. So I only bring that because I do believe that it impacts the deference that this court would give to findings. Counsel, just as Pope says, now that I understand the point you're making, that's almost every administrative hearing case we get. And it's the fiction that I remember noticing 27 years ago I first got in this court when I'm looking at the deference due to judges as fact finders. They actually hear the evidence. Here, the fiction is the commission or the administrative agency is making this determination when, in fact, they're just relying upon an ALJ. But that's what the law is, that we're supposed to view this as if the entire commission is supposed to have rendered this factual judgment. Well, no, I think my point was this was a hearing officer, unlike an administrative law judge that has particular obligations and duties pursuant to the administrative office. Here, it was someone who was appointed by the statute and I would assert doesn't rise to the same level as an administrative hearing officer or an administrative law judge in an unemployment proceeding. I still believe, even if we accept that this particular hearing officer meets the criteria of an administrative law judge, that he did not appropriately determine the facts based on the manifest weight and I would also assert that he did not appropriately apply the law. First, for example, the time period that the hearing officer looked at in terms of determining the prima facie case of Mr. Tapley and whether or not he established a prima facie case of gender discrimination, the hearing officer said the time period of November 6, 2012, when the incident occurred that led the employer to make the decision to terminate this gentleman is not the time period that is significant in determining that prima facie case. I would assert to your honors that the Bearcat v. Taco Bell case clearly indicates that the law in Illinois is that the time period when the fact finder weighs whether or not the claimant is meeting the reasonable expectations of the employer is immediately prior to the last event that led to his separation. And every single individual who testified in this case said that Mr. Tapley was separated because of the incident that happened on November 6, 2012. There is nothing in the record that suggests that the September 2012 event that the hearing officer retroactively looked at when there were issues relating to whether or not Mr. Tapley had properly reported that he was at the hospital with his child, that's when Erica Thurman was his supervisor. And in September of 2012, she met with Mr. Tapley and she disciplined him in writing. He signed off on that. He never came to the Human Resources Department of the YWCA prior to November 16 and claimed that he had been discriminated against because of that September event. In fact, he testified at the hearing that he had never reported any concerns about discrimination. The November 6 incident, I would assert to your honors, is what led to Mr. Tapley's termination. And I would assert that the other issue of law, error, that the hearing officer made in this case and that the commission adopted, is that the hearing officer essentially required the employer in this case to prove beyond a reasonable doubt the articulated reason for the employer's termination of Mr. Tapley. Every single individual who testified that Mr. Tapley had an event with the intern on November 6, 2012, that that particular event involved three individuals. Eric Tapley, Hillary Pasha, and Hannah Cohen, who was an intern through Illinois State University. Each of those individuals, as the hearing officer notes, gave their perspective of the event. But I think it's extremely important in terms of weighing that testimony against whether or not the employer articulated a legitimate reason for the termination, that Eric Tapley admitted that he had confronted the intern. He admitted that under his breath, he had made derogatory statements about the intern. Hillary Pasha, who was also a preventative education specialist who had a legal medical advocacy role for the YWCA, said in her testimony that she felt that Mr. Tapley was her friend and that they were close friends. I would assert to your honors that her description of the events of November 6 have the most credibility because she was completely unbiased. The hearing officer chose to disregard even Ms. Pasha's description of what happened. Ms. Pasha affirms that Mr. Tapley made derogatory statements to the intern and also that he was acting abrupt and disrespectful and that she deemed that Mr. Tapley's actions, because he was an employee of the YWCA and superior to the intern from Illinois State University, that it was an inappropriate act. Well, didn't she think the intern acted inappropriately and unprofessionally? She did testify, your honor, that she felt after everything had happened that Hannah probably didn't handle it in the most professional manner. But she says in her testimony that was after Mr. Tapley had essentially told her to sit herself down and to know her place. And so after that, Hillary Pasha then told Hannah to leave the location, go to lunch, and Hillary then immediately contacted Nicole Kirsten, who was one of the directors of the program, who was on vacation, and advised her that this event, this particular event happened. Does there also seem to be a consensus that the intern is the one who instigated the confrontation and that she inserted herself into the conversation between Mr. Tapley and Pasha? Ms. Pasha? I would assert, your honor, that that is certainly what Mr. Tapley states. Does Ms. Pasha also indicate that? I believe Ms. Pasha says that Hannah was delivering my lunch, there was an error with my lunch, and Mr. Tapley came over as the two of us were at the desk, and Mr. Tapley started talking to Hillary Pasha about wanting to take the shrimp out of her lunch. And at that point, Hannah said, she's already told you that she didn't want to be bothered, you're not listening to her. So you agree then that she, the intern, initiated the conversation with Mr. Tapley. It wasn't as if Mr. Tapley said something to the intern first. The intern said something to Mr. Tapley first when the intern became concerned about how he was interacting with Ms. Pasha. I would agree with your honor that the intern became concerned about how Mr. Tapley was interacting with Hillary. And so what did Mr. Tapley say to the intern before the intern said, she told you no or leave her alone. What did he say to the intern before that happened? Before that, all he did was come up to the conversation that Hillary and Hannah were having. But his behavior after that, I believe gave this employer the legitimate right to separate this employee. And I think that the hearing officer lost his way in terms of looking at the legal obligation of the standard that an employer has to meet to articulate a legitimate business reason. This is not similar to the Warren case or the Quincy case where there was some misguided assertion to the employee about why they were being separated. Mr. Tapley here was told on November 16th that you are being separated as a consequence of your inappropriate behavior and rude behavior with the intern. So the employer is allowed to make that personnel decision. There is nothing in the record that indicates that personnel decision was made because Mr. Tapley was a man. Well, I think the implication, you know, the hearing officer wrote like a 40-page decision in this case. When I read it, it seemed to me he was relying on some inferences that could be drawn from the fact that Mr. Tapley was never even given an opportunity to tell his side of the story. He was never asked what happened. They did not discipline the intern who could be viewed, based on my reading of it, as equally at fault. So the implication from that would be that he was replaced by a woman, that they were waiting for an opportunity to get rid of him and they seized on this without even giving him a chance to explain his side of the story. But there is no evidence that they were waiting to seize on him. In fact, the evidence is to the contrary. Well, there was some evidence that when the new boss came in that he was the only one when he went in that she was negative towards. She didn't even know him. All the other employees had come out of that meeting and said she was great, really nice. He went in there and she challenged him about something that had happened when she wasn't even there. But he had missed an appointment. But nothing happened to him as a consequence of his interaction with Maribeth Clapp on that particular October date. And again, I think that the case law clearly says that, you know, in weighing these kinds of circumstantial situations about pretext, we have to be careful not to put ourselves in the role of the personnel department of the employer because the employer is allowed to make personnel decisions. I will agree with Your Honor that prior to November 16th, nobody reached out to Mr. Tapley to get his side of the circumstance. But they did talk with Hillary Pasha. They did talk with the intern. And when HR was in the meeting with him on November 16th, he didn't offer his version of the event. They had already made the decision by then to terminate him, and that was the purpose of the meeting. They had made the decision, but they had a legitimate basis to make the decision. And this was not an instance where past supervisors had said, like you had in the Warren achievement case or in the Quincy case, I'm going to get you. This is an incident where we are going to make sure we get rid of you. In the Warrant Achievement case, actually, the event that the employer relied on happened in January of 1990. The employer said that really wasn't that big of a deal relating to that sexual harassment, and then many months later they tried to strap that back in. This particular employer immediately investigated this event. There were communications. Was it a complete investigation when you don't speak to all the parties involved? Well, certainly I would have likely managed the investigation differently if they had retained counsel to do that. However, the case law clearly says they can rely on the oral statements of employees and supervisors that they spoke to, and it's very possible that the CEO of the Y decided at that point in time, I've talked to Nicole, I've talked to Hillary, I've talked to Hannah, and on that basis I believe because of his authority over the intern, and he is the one who testified that he did not answer directly to anyone, that it was his belief by virtue of the way that the Y was being managed at that time that he was not directly answerable to anyone, and clearly Hannah, the intern, was directed and had to be supervised by Nicole Kirsten. I guess counsel, I mean, as we all here know, in these types of cases, it's rare that we're going to have a situation where someone says to you, I don't like the fact that you're a man and working here, and so I'm going to do everything I can to get rid of you. I mean, we have to look at inferences and the entire context, and so it seems that you're criticizing the hearing officer for the depth, in my opinion, that was shown, but wasn't that a part of the hearing officer's determination as to whether or not this was a pretext, that the reason given was a pretext in looking at the entire big picture, so to speak? Well, he certainly determined based on a certain mosaic of circumstances, as he describes it, that it was pretext, but then he ends his query there, and I believe that the Seventh Circuit cases that I've cited to your honors clearly indicates that even when there is pretext, the plaintiff still has the final burden of going forward to establish that gender was the determining factor. Doesn't the failure to interview Mr. Tapley by the administrators permit an inference that maybe they didn't want him, they were going to use this as an excuse to get rid of him? I would suggest, your honor, that it doesn't in this case, because all of the testimony from those individuals who were decision makers, in particular Jane Chamberlain and Nicole Kirsten, were positive for Mr. Tapley. They wanted him to have this role in this program. They wanted a male in the program. What does the record show as to why they didn't interview him about the incident in question? They simply did not believe that they needed to. Kamakshi, the HR person, testified that prior to this event he had never made any claims of any issues with the manner in which management was interacting with him. And it's my belief that the administrative supervisors determined that they had sufficient evidence given the nature of his position with the program and that the program was a situation where they were empowering women and it was appropriate for them to have that particular stepping stones program. Well, the incident we're talking about was relatively short. The failure to talk to him about it is, it seems to me, can give a legitimate inference or an insight into what may have been their ultimate thinking, that they didn't want to do it because they had made up their mind. And why had they made up their mind? Well, maybe for the reasons you suggest, but maybe because they didn't want this guy there anymore. And I guess that to me begs the question because we're left with maybe they didn't manage it from a personnel standpoint like you and I would, but there was not even any circumstantial evidence that the reason that led to his separation was his gender. Thank you. Thank you, Counsel. You'll have more time on rebuttal. Thank you. Are you ready to proceed, Counsel? We are. And you're doing 10 minutes in 10 minutes, right? Thank you. Good afternoon, Justices. May I please support, Counsel? I'm going to try to cover the issue of whether Ms. Cohen was similarly situated to Mr. Tapley and also address the issue of whether the Human Relations Commission, their ruling on whether pretext was actually found. Either of those are against the manifest way of the evidence. I do have to start out, Your Honors, by saying this is a very disappointing case to not only my client, but I think to McLean County, that this has gone on for four years. The YWCA with a mission statement of eliminating racism, empowering women, promoting peace, justice, freedom, and dignity for all, and we're here almost four years later when the right thing for the YWCA to do would have been to have addressed and solved this discrimination issue. With regard to whether Ms. Cohen is similarly situated to Mr. Tapley, as noted in our brief, Ms. Cohen performed almost every duty, 22 of 23 duties, the same duties that Mr. Tapley performed. The only duty she didn't perform on his job description was him working with sexual assault victims and educating the community. Even Ms. Clapp and Ms. Chamberlain, both management, indicated that she too was obligated to support the mission statement. If she violated workplace rules, she would be held to the same standards as an employee would be. Similarly, the definition in the Bloomington Ordinance of an employee certainly establishes that Ms. Cohen was similarly situated to Mr. Tapley, that definition being a person, whether paid or unpaid, who performed services under the direction or control of the employer. I disagree with counsel's representation that there is anything in the record that Mr. Tapley indicated that he didn't answer to anyone. In fact, his testimony was that Ms. Kirstein supervised him. In fact, we had to submit an exhibit after the public hearing to establish that Ms. Kirstein had in fact signed off on documentation on absentee sheets as his supervisor. With regard to the commission's ruling then that she was similarly situated, clearly that is not against the manifest way of the evidence. With regard to whether pretext was established, counsel has indicated that surprisingly, quite frankly, that there was no evidence of gender bias. It's throughout, it's replete throughout the record. Mr. Tapley was the only male in the program. He was replaced by a female. When Ms. Clapp, as Justice White earlier noted, when Ms. Clapp met with everyone, when she started as the director, everyone else had a great meeting with her. All the female, white females had a great meeting with her, whereas when Mr. Tapley met with her, she accused him of not liking his job and chastised him for missing a speaking engagement, which he admitted he had done. She had missed one also. He was apologetic, but yet she chastised him. And she also subsequently wrote a letter that went into his personnel file, which he wasn't aware of, about him missing that meeting. His supervisor, Kirstein, thought that his conduct was in violation of women's policies, and the YWCA needed to empower women. Even though Cohen was bound by the same policies, everyone talked with Cohen, no one talked with Tapley. Ms. Cohen admitted that she had interjected herself into the conversation. Ms. Cohen had even admitted that obviously her behaviors were not professional. But yet, the management takes the word of three females, one who was not even involved in the incident, or at the incident, Ms. Kirstein, and no one talks to the only black male involved in the incident. A termination notice for Mr. Tapley was prepared before they even met with him. So there was no possibility, they weren't there to consider whether to terminate him, they had decided to terminate him. In fact, as the hearing officer noted, Ms. Chamberlain tried to even get more evidence against him in asking about whether there were schools that didn't want him to work. Mr. Tapley worked really hard for this sexual assault program. He had an excellent reputation in the community, and he did not deserve to be treated in the fashion he was. Ms. Cohen also indicated she found her interaction troubling because she was working for a feminist organization. The management here, your honors, certainly missed the point of the discrimination, and they continue to this day to miss the significant discriminatory treatment that Mr. Tapley was put through. And continues to be put through. If this wasn't a gender issue, why then does the current executive director in Discovery, Dante Lawson, when asked what was the basis for Mr. Tapley's termination, Dante Lawson says the basis was Mr. Tapley's behavior toward two female employees. If it doesn't have to do with gender, why would they even point out that it was two female employees? Clearly we have, the Human Relations Commission was not wrong in ruling in the way they did. Their findings and their conclusions are clearly not against the manifest way to the evidence. When Chamberlain terminated Mr. Tapley with a smirk, they then replaced him with a female. We ask you, your honors, to tell the YWCA that they finally have to address their discriminatory behaviors and to affirm the findings of the Human Relations Commission. Thank you. Thank you. Mr. Mordoff. Thank you, and may it please the court, counsel. My name is Greg Mordoff, and I represent the City of Bloomington Human Relations Commission in this matter. I'd like to begin, I'm not going to touch on the McDonnell-Douglas framework in the beginning because there are some other issues outstanding. First off, several issues were raised in the notice of appeal that were not briefed, and I ask that this court deem those waived. However, since we cannot waive jurisdiction, I just want to articulate that there is a 30-day provision where the hearing officer that is hired for these hearings is supposed to send his decisions to the commission so the commission can render a quick judgment. However, in this case, the hearing officer did not send his proposed order to the commission for three months. This is not a jurisdictional issue. That's a procedural command. A procedural command would be deemed discretionary unless one of two exceptions are met. Neither exception was met in this case, and so I believe this court has jurisdiction to hear this matter. YWCA has also asserted an affirmative defense, namely that Mr. Tapley falsified his employment application in the sense that he did not disclose two misdemeanor marijuana possession charges on his application. An affirmative defense, the burden is on YWCA to prove this affirmative defense. They had three prongs to hit. They would need to show that Mr. Tapley actually did falsify his application, that they had no knowledge of that falsification, and that had they had knowledge of that falsification, he would have been terminated. They did not show any of these. The application was not admitted into the record, and the only misdemeanor that I could glean that needed to be revealed was providing or were misdemeanors for fraud. Additionally, there was testimony that in his interview process there was a ding, and that YWCA did not follow up or did not think that that would be an issue. So they didn't prove that they didn't have knowledge of this. And finally, there's no testimony from the CEO to his supervisor to the human relation or to their human HR department. There's no testimony that that would have been a fireable offense. So I believe that the second affirmative defense should have been denied and that decision should be affirmed on appeal. Now moving to the assertion that Mr. Tapley failed to prove a prima facie case because he was not meeting legitimate business expectations at the time of his termination. Counsel for YWCA has asserted that the determination should be looked at November 6th with the date of the incident only. Now, despite YWCA's assertions that a whole plethora of things went into his termination, it seems to be now we are focusing on November 6th or would like to focus at that time. Up until that date, Mr. Tapley was meeting legitimate business expectations, and the McDonnell-Douglas framework is established in the way it is, so employers cannot use an instant of transgression to impose disproportionate sanctions against a suspect class and a non-suspect class. If that were the case, then any minor infraction could give people with employment decisions the ability to discriminate wrongfully. So the prong Mr. Tapley had to show and did show that he was meeting legitimate business expectations up until that time and then through that time until he was terminated. I agree that this Court does not sit to review personnel decisions. However, their decisions cannot be made based on impermissible stereotypes. One of those stereotypes is present in this case, and the hearing officer determined that when you have a situation where there is an argument between an African-American male and a white female, and the African-American male is described as the aggressor, as intimidating, and as using power control tactics, and the white female is treated as a victim in this case and her statement is taken and that's the investigation. He found that that was enough evidence to show pretext and not just show that the reason for his termination was made up by YWCA as has been asserted here today, but that the reason it was made up in the underlying decision was based on the impermissible inference of discrimination. For those reasons, the hearing officer looked at all the facts, weighed those facts, and determined that YWCA in terminating Mr. Tapley and not imposing any discipline on Ms. Cohen, engaged in wrongful employment discrimination, and awarded damages accordingly. And if there are no questions? No. Thank you, counsel. Any rebuttal, Ms. Wall? Very briefly, Your Honors. Both counsel indicated that Ms. Cohen did not have any discipline. I would assert to Your Honors that actually her supervisor was notified of this event at Illinois State University, and certainly her internship did not terminate. But there was a reach-out, and Nicole Kirsten said to her, I am going to have to notify your professor about this event. And did you know what the nature of that notification was? I mean, was it we had a problem with your intern or we're sorry your intern was harassed by a male employee? No, I believe Nicole Kirsten's testimony was that, in fact, she reported the unprofessional response by Ms. Cohen to the professor. But again, she was not an employee of the YWCA. I would assert that she's not a similarly situated employee, as counsel suggests, because counsel said I represented that Mr. Tapley said that he didn't answer to anyone. It's on page 38 of his testimony, and the hearing officer found that Mr. Tapley himself said, I essentially don't answer to anyone, and the intern clearly did answer to Nicole Kirsten. So if she wasn't an employee, what could the Y have done to her, anything? Well, we don't have evidence of what the ISU contract was on this internship. So they would have no ability, I mean, irrespective of what the ISU contract says, are you suggesting they have no ability to discipline her, that they would be required to allow her to continue? No, I think they did actually discipline her in this instance, and her supervising individual notified the professor about it. Right, but you said she's not an employee, and my question is, do you believe that they had to allow her to continue to work there? I mean, in Mr. Tapley's case, they thought the situation was bad enough to fire him, so do you think that they could not say to her, we no longer want you to serve as an intern here? I believe they could have done that, certainly, Your Honor. They were not ordered by anyone to keep her there as an intern, but I do believe that the nature of the offense and Mr. Tapley's role as a prevention specialist versus an intern, and he was deemed superior to Hannah Cohen, the intern, I do believe that that is a significant difference, and that it is not a distinction without a difference. With respect to the second affirmative defense, Your Honor, the hearing officer finds here that Mr. Tapley admitted that he falsified information on his employment application, and the hearing officer, that's at page 29 of his decision, and he also cites a case, which I believe is appropriate, the Bush versus Walmart case, to say that when there is evidence that an employee has falsified information on an employment application, it can be deemed grounds for the employer to terminate. But did they know that before they terminated him? They did not, but the law does not require them to. The law indicates that if they would have known it, would they have terminated, and Nicole Kirsten and Dante Latson both said that because of the drug convictions and the specific policy that was placed in the record requiring employees to report drug convictions. He didn't have convictions. He did have convictions. He admitted to the convictions. He had two convictions, and he admitted it in the record. Convictions? Were they ordinance violations? No, they were not ordinance violations, and his convictions were deemed admitted and in the record. The argument of the employee was that they happened before he was employed, so he didn't have an obligation to report. But didn't they discover those when he submitted his application? In other words, that was the ding that turned up? No, actually, the finding by the hearing officer is accurate with respect to the testimony that it was an obstruction of justice conviction with a police officer that was the ding. That didn't prevent them from hiring him? It didn't cause Jane Chamberlain to separate him when she discovered it in September of 2012. However, there was testimony that if they had known about the drug convictions because of the nature of their policy requiring disclosure that it would have led to the termination. That was Nicole Kirsten who testified to that and also Dante Latson. Their policy related to existing employees reporting convictions that happened subsequent to the employment. Isn't that right? No, that is not right. That is how the hearing officer described that language, but the plain language does not state that. And Mr. Tapley admitted that he had not disclosed those convictions to the YWCA, and I would assert that the case law says that's an appropriate affirmative defense. And here the hearing officer acknowledges that, but then on the next page just says, but I'm denying it. What page are you looking at? 29 and 30, I believe, Your Honor. But you agree that these were convictions that happened prior to his being hired by the Y? Yes, but I also would assert to Your Honors that he admitted in the testimony at trial that he failed to disclose those to the YWCA, and we did not learn about it until trial. We had the benefit of his deposition testimony from a federal case, and he admitted those convictions. Thank you, Your Honors. I see my time is up. Thank you. We'll take this matter under advisement and be in recess until the next case.